IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Mattie S. Brooks, )<br><br>Plaintiff, )<br><br>vs. )<br><br>Michael J. Astrue,<br>Commissioner of Social Security, )<br><br>Defendant. )<br>_____ ) | Civil Action No. 6:10-152-HFF-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

      This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

      The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

### ADMINISTRATIVE PROCEEDINGS

      The plaintiff filed applications for disability insurance benefits (DIB) and supplemental security income (SSI) benefits in June 2007, respectively, alleging that she became unable to work on May 28, 2007. The applications were denied initially and on reconsideration by the Social Security Administration. On February 13, 2008, the plaintiff

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

requested a hearing. The administrative law judge, before whom the plaintiff, her attorney, and a vocational expert appeared on July 17, 2009, considered the case *de novo*, and on September 4, 2009, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The administrative law judge's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on November 24, 2009. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

(1)    The claimant meets the insured status requirements of the Social Security Act through June 30, 2011.

(2)    The claimant has not engaged in substantial gainful activity since May 28, 2007, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

(3)    The claimant has the following severe impairments: degenerative disc disease of the lumbar spine, fibromyalgia, depression, and anxiety (20 CFR 404.1520(c) and 416.920(c)).

(4)    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

(5)    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except she is limited to simple, routine tasks and only occasional contact with the public.

(6)    The claimant is capable of performing past relevant work as a machine loader. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

(7)    The claimant has not been under a disability, as defined in the Social Security Act, from May 28, 2007 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. §423(a). "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability

3

to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there

4

is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 52 years old at the time of the hearing. She graduated from high school and has past relevant work as a cashier and machine tender. She alleged disability beginning May 28, 2007, due to anxiety attacks, headaches, pinched nerve in her back, shoulder pain, fibromyalgia, diabetes, hemorrhoids, and pyorrhea of the gum (Tr. 33-41).

In April 2007, one month before the alleged onset of her disability, the plaintiff reported a heavy menstrual period with clotting and cramps. An examination a couple weeks later revealed a friable cervix, and it was noted that the plaintiff needed an endometrial biopsy (Tr. 268). A Pap smear was positive for malignant cells consistent with adenocarcinoma (Tr. 287, 294). In May 2007, the plaintiff told Kathleen Pursley, LCSW, that she was frustrated because she feared cancer and could not get approval for surgery (Tr. 239-40).

Also in May 2007, the plaintiff saw Dr. Jonathan Parker to follow up regarding an abnormal Pap smear. A physical examination was normal. Dr. Parker ordered a colposcopy and hysteroscopy due to the positive Pap smear (Tr. 219-220). The results of these tests and other tests showed no evidence of malignancy (Tr. 222-23, 285, 289). In June 2007, the plaintiff told Dr. Parker that she was feeling well overall and that she did not have any significant bleeding or pain (Tr. 282). Later that month, Dr. Parker recommended a hysterectomy despite the negative pathology due to the risk of ovarian or fallopian tube cancer (Tr. 282).

In June 2007, Ms. Pursley noted that the plaintiff was responsive, attentive, lucid, open/unguarded, anxious, and preoccupied. She said the plaintiff responded

appropriately and was independent in a home without an assistive device, but said she could not work due to chronic pain and vaginal bleeding (Tr. 240-41).

On July 13, 2007, Neil Sondov, M.Ed, LPC, provided a letter stating that he had seen the plaintiff for two individual therapy sessions that focused on stress management related to recent grief issues and ongoing familial relationship issues. He noted that the plaintiff mentioned she was on medical leave from work, but stated that no issues pertaining to possible impairment had been explored at that juncture. He also noted that the plaintiff had seen another counselor from September 2006 to December 2006 for parent-child relational issues (Tr. 193).

A CT scan of the plaintiff's abdomen and pelvis conducted on July 18, 2007, showed two benign-appearing cysts on her liver as well as a probable ovarian cyst (Tr. 202).

On July 23, 2007, Dr. Parker examined the plaintiff and noted normal findings. The plaintiff reported no abdominal, muscle, or joint pain. Dr. Parker performed the scheduled hysterectomy, and noted that the plaintiff did extremely well post-operatively. Pathology from the hysterectomy showed no evidence of cancer (Tr. 195-98). By July 31, 2007, the plaintiff reported that she was doing well other than occasional diarrhea and some pelvic pressure, and said that her pain was well controlled with very little pain medication (Tr. 312).

On August 9, 2007, the plaintiff called Dr. Parker's office and complained she was suffering from side pain and burning down to her upper leg, but could not get anyone to help her come in to his office (Tr. 313). One week later, the plaintiff told Dr. Parker that she had tenderness, burning, and pain to palpation on the left side of her incision, but no other issues. Dr. Parker observed that the incision was well-healed. Although there was tenderness and inflammation just below the skin, he expected this was a local reaction that

would resolve on its own. He refilled the plaintiff's prescription for Lortab (for pain) and placed her on Premarin (an estrogen hormone) for hot flashes (Tr. 314).

On August 20, 2007, the plaintiff saw Ms. Pursley and denied she was in any pain (Tr. 244). The plaintiff agreed to be discharged from Ms. Pursley's care. At the time of discharge, Ms. Pursley indicated that the plaintiff was responsive, attentive, lucid, optimistic, and appreciative (Tr. 249).

Nonetheless, on August 22, 2007, the plaintiff complained of painful urination and was diagnosed with a urinary tract infection. She received a prescription for an antibiotic (Tr. 238). Two days later, she complained of significant hot flashes as well as abdominal pain. Dr. Parker noted that the plaintiff had not gone for a prescribed CT scan. He increased her dose of hormones, and explained they might take some time to work (Tr. 275).

A CT of the plaintiff's abdomen conducted on August 28, 2007, showed mild gaseous distension of the sigmoid colon and mild increased density within the gallbladder (Tr. 203-04, 276-77). On September 18, 2007, Dr. Parker noted that the plaintiff was doing very well on the hormones for hot flashes. However, the plaintiff reported significant depressive symptoms including insomnia, fatigue, loss of appetite, and irritability. Dr. Parker prescribed an anti-depressant (Lexapro) (Tr. 275).

Dr. Robbie Ronin completed a psychiatric review technique form on September 28, 2007. He indicated that the plaintiff had situational depression and situational stress, but concluded that these impairments were not severe within the meaning of the Social Security Act. He said these conditions caused no more than mild restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. He noted that the plaintiff was in counseling for situational stressors only (Tr. 253-65).

On October 23, 2007, the plaintiff returned to Dr. Parker, who noted that she did not have good results on Lexapro. He also noted that she continued to have low back spasms. He prescribed a different anti-depressant (Cymbalta), as well as a muscle relaxer (Flexeril), and a non-steroidal anti-inflammatory drug (Aleve) (Tr. 274). The plaintiff returned to Dr. Parker on November 20, 2007, at which time he noted that she was doing well on Cymbalta and her menopausal symptoms had decreased. He said she continued to have back spasms, and changed her muscle relaxer to Soma (Tr. 273).

The plaintiff presented to the Rosa Clark Medical Clinic on December 6, 2007, and reported chronic headaches, back pain, and swelling in her legs, which she said had persisted for two months. The physician found no edema and diagnosed migraine and calf pain. He ordered testing for deep vein thrombosis and prescribed medications for the plaintiff's migraines (Tr. 267). A few days later, the plaintiff complained of continued back pain during an appointment with Dr. Parker. Dr. Parker noted that this was diagnosed as musculoskeletal pain, and said that Flexeril worked but was not perfect. He indicated that the plaintiff's back was tender to palpation, but found no evidence of sciatica. He scheduled the plaintiff for physical therapy (Tr. 272).

Debra C. Price, Ph.D., completed a psychiatric review technique form on January 2, 2008. Like Dr. Ronin, she concluded that the plaintiff had no severe mental impairment (Tr. 295-307).

The plaintiff went to three appointments at Calhoun Family Chiropractic in January 2008. Dr. Calhoun performed spinal manipulation treatment and indicated that the plaintiff's prognosis was good (Tr. 318, 320). He recommended a total of 60 relief and corrective visits (three times a week for 90 days), and recommended that she use a neck block at home (Tr. 321). There is no indication in the record that the plaintiff followed Dr. Calhoun's recommendation for further treatment.

8

In February 2008, the plaintiff returned to the Rosa Clark Medical Clinic and complained of neck, back, and leg pain, as well as headaches and dizziness (Tr. 354). X-rays of the cervical spine were normal. X-rays of the lumbosacral spine showed "[m]ild bilateral facet hypertropy at L4-L5 and L5-S1" and "[p]erhaps some degenerative disc changes with mild loss of disc height at L4-L5" (Tr. 337). In addition, "modest" degenerative changes were seen in the thoracic spine (Tr. 338). X-rays of the plaintiff's left shoulder were normal (Tr. 338). An ultrasound of her legs showed no evidence of deep vein thrombosis (Tr. 341). She was given prescriptions for an antihistamine (Allegra), a nonsteroidal anti-inflammatory drug (Mobic), and a migraine medication (Imitrex) (Tr. 354).

In March 2008, the plaintiff complained of left arm pain. She also said she had an itchy rash from her medications, that she slept poorly, and that she felt worse when she tried to exercise at the gym. Records from the Rosa Clark Medical Clinic indicate that the plaintiff's mild degenerative joint disease or degenerative disc disease was "not enough to justify 9/10 pain scale." The notes state that the plaintiff was tender at all trigger points but had no tenderness with rotation of the left shoulder. The diagnosis was fibromyalgia, and the plaintiff received prescriptions for an antidepressant (Amitriptyline) and for Gabapentin (an anti-epileptic medication that is also used to treat nerve pain) (Tr. 358). One month later, the plaintiff reported that she felt a bit better. She received prescriptions for a narcotic-like pain reliever (Tramadol) and Cymbalta (which is used to treat fibromyalgia as well as depression) (Tr. 360).

In August 2008, the plaintiff complained of daily headaches and had high blood pressure. She received a prescription for a beta-blocker (Propropol), and was told to take over-the-counter magnesium (Tr. 363). On September 10, 2008, the plaintiff said her left ear was ringing and that she had a headache the day before causing nausea. However, the intensity or frequency of the headaches had decreased (Tr. 363).

On October 8, 2008, the plaintiff complained of a headache that caused nausea and occasional vomiting. She described it as the worse headache of her life. She was taking her beta-blocker but not her anti-migraine medication (Imitrex). She was told to take Imitrex and given a prescription for an anti-nausea medication (Phenergan) (Tr. 365). A CT scan of her head was normal, and there were no significant changes in her brain when compared to a CT scan conducted when the plaintiff complained of headaches in August 2006 (before the alleged onset of her disability) (Tr. 191, 271, 343).

In January 2009, the plaintiff was diagnosed with joint and muscle pain and given a prescription for a muscle relaxant (Soma) (Tr. 367).

At the hearing, the plaintiff testified that she stopped working in May 2007 when her employer told her she could not return to work following a hysterectomy (Tr. 124-25). When asked what health problems prevent her from working, the plaintiff first identified anxiety (Tr. 33). She could not remember what anxiety medication she was taking, but said it helped (Tr. 34). She also testified that she had "very bad headaches," and said Allegra helped to a certain extent (Tr. 35). The plaintiff said that when she got a bad headache, she would need to lie down on the floor, and that on several occasions she had a migraine so bad that she needed to go to the hospital for a shot (Tr. 36). She said the headaches were so severe that she needed to lie down three or four times a week, and that the headaches would at times last eight to nine hours (Tr. 50). In addition, the plaintiff said she had a pinched nerve in her back that required cortisone shots. She did not know what triggered her back pain, but said that it started right after her hysterectomy (Tr. 38-39). She also said that her left shoulder would "freeze up," and that both shoulders tended to ache and swell (Tr. 39). In addition, the plaintiff said that she had been given medications and exercises for fibromyalgia, that she also had diabetes, but that it was under control (Tr. 39-40).

10

The plaintiff testified that the farthest she could walk before needing to sit down was about 10 feet because she was off balance (Tr. 41). She said the longest she could walk or stand was about 20 minutes, and that the longest she could sit before needing to get up was 20 to 30 minutes (Tr. 42-43). She said the most she could lift was five to seven pounds (Tr. 43). The plaintiff felt her depression and anxiety affected her ability to focus and concentrate and to be in public and said she had no friends (Tr. 43). She said that she spent her days reading or doing crossword puzzles because she could not operate the new gadgets on the television set (Tr. 44). The plaintiff said she had a driver's license but did not drive any more because in 2007 she ran into the side of a house while she was on medication (Tr. 46-47). She said that her daughter did the cooking and she went grocery shopping when her daughter took her (Tr. 48). She said she put her clothes in the washer and dryer, but her daughter kept the house immaculately clean and the only chores she did was cover the bed or wash out the sink (Tr. 48).

Vocational expert Kathleen Robbins testified at the hearing that the plaintiff's past relevant work as a machine loader involved loading checks into a machine. She said that the four months the plaintiff performed this job was long enough for her to learn how to do this unskilled job (Tr. 52-53). She said that although the Dictionary of Occupational Titles lists this job as medium[2] work, the plaintiff testified that it did not involve lifting any weight, so the job would be a light[3] job as the plaintiff performed it (Tr. 56). The ALJ asked Ms. Robbins to assume a person of the plaintiff's age, and with the plaintiff's education and work experience, who could lift 50 pounds occasionally and up to 25 pounds frequently, but

---

[2]Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. 20 C.F.R. § 404.1567(c).

[3]Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. 20 C.F.R. § 404.1567(b).

11

was limited to simple, routine, repetitive tasks and occasional interaction with the public (Tr. 57). Ms. Robbins testified that such an individual could perform the plaintiff's past relevant work as a machine loader and that the individual could also do other work in the national economy, including the representative jobs of housekeeper, landscaper, and hand packager (Tr. 57-58).

## ANALYSIS

The plaintiff was 52 years old at the time of the hearing. She graduated from high school and has past relevant work as a cashier and machine tender. She alleged disability beginning May 28, 2007, due to anxiety attacks, headaches, pinched nerve in her back, shoulder pain, fibromyalgia, diabetes, hemorrhoids, and pyorrhea of the gum (Tr. 33-41). The ALJ found that the plaintiff's degenerative disc disease of the lumbar spine, fibromyalgia, depression, and anxiety were severe impairments. The ALJ also found that the plaintiff had the residual functional capacity ("RFC") to perform medium work but limited her to simple, routine tasks and only occasional contact with the public. He further found the plaintiff was capable of performing her past relevant work as a machine loader. The plaintiff argues that the ALJ's decision is not supported by substantial evidence and the ALJ erred by (1) finding that she did not meet Listing 12.04 (Affective Disorders); (2) finding that she had the RFC to perform medium work; and (3) finding that she could perform her past relevant work as a machine loader.

### *Motion to Remand*

The plaintiff attached to her brief a Physical Capacities Evaluation ("PCE") form dated June 10, 2010. She argues as follows:

> [The PCE] indicates she should never/occasionally lift/carry up
> to 10 lbs. It indicates she is capable only occasionally of simple

12

> grasping, handling, feeling, fingering, reaching, and pushing/pulling with her right and left hands/arms. It indicates she is not capable of hand manipulating. This medical documentation refutes the Administrative Law Judges' decision that Ms. Brooks has the residual capacity to perform medium work. Additionally, the PCE is consistent with the testimony of Ms. Brooks.

(Pl. brief at 7, ex. A).

The ALJ's decision in this case was dated September 4, 2009. Accordingly, the above evidence was not part of the administrative record. In determining whether the ALJ's decision was supported by substantial evidence, a district court cannot consider evidence that was not presented to the ALJ. *See Huckabee v. Richardson*, 468 F.2d 1380, 1381 (4th Cir. 1972 ) ("Reviewing courts are restricted to the administrative record in performing their limited function of determining whether the Secretary's decision is supported by substantial evidence.").

Apparently in recognition of the fact that this court cannot consider the PCE, in her reply brief, the plaintiff moved for a Sentence Six remand. Sentence Six of 42 U.S.C. § 405(g) provides in pertinent part: "The court ... may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding[.]" 42 U.S.C. § 405(g). A reviewing court may remand a case to the Commissioner on the basis of new evidence only if four prerequisites are met: (1) the evidence must be relevant to the determination of disability at the time the application was first filed (i.e., during the relevant period); (2) the evidence must be material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him; (3) there must be good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant must make at least a general showing of the nature of the new evidence

to the reviewing court. *See Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985), superseded by statute, 42 U.S.C. § 405(g), as recognized in *Wilkins v. Sec'y, Dept. of Health and Human Servs.*, 925 F.2d 769, 774 (4th Cir. 1991).[4]  The Commissioner argues the plaintiff has not satisfied the prerequisites for a Sentence Six remand.  This court agrees.

Here, the plaintiff has made a showing of the nature of the new evidence as she has attached it to her brief.  Further, she contends she can show good cause for her failure to submit the evidence when the claim was before the Commissioner because she lacked transportation and sufficient finances to obtain a PCE prior to traveling to Virginia to stay with her daughters for several months in 2009 (pl. reply 3).  However, the PCE does not qualify as new and material evidence.  The June 10, 2010, PCE form reflects an opinion of the plaintiff's abilities as of that date and does not purport to offer an opinion as to the plaintiff's abilities at any time period relevant to the ALJ's decision, i.e., from her May 28, 2007, alleged onset of disability until the ALJ issued the final administrative decision denying her claim on September 4, 2009.

Based upon the foregoing, in determining whether the ALJ's decision is based upon substantial evidence, this court will not consider the June 10, 2010, PCE form and, furthermore, this court recommends that the plaintiff's request for a Sentence Six remand be denied.

---

[4] "Though the court in *Wilkins* indicated in a parenthetical that *Borders'* four-part test had been superseded by 42 U.S.C. § 405(g), the Fourth Circuit has continued to cite *Borders* as the authority on the requirements for new evidence when presented with a claim for remand based on new evidence, and the U.S. Supreme Court has not suggested that the *Borders* construction of § 405(g) is incorrect." *Ashton v. Astrue*, C.A. No. TMD 09-1107, 2010 WL 3199345, at *3 n. 4 (D.Md. Aug. 12, 2010) (citing cases).

***Listing 12.04***

The plaintiff argues the ALJ erred in finding that she did not meet Listing 12.04. The regulations state that upon a showing of a listed impairment of sufficient duration, "we will find you disabled without considering your age, education, and work experience." 20 C.F.R. §404.1520(d). To be disabled under the Listings, a claimant must present evidence her impairment meets or is "medically equivalent" to a listed impairment. *See Kellough v. Heckler*, 785 F.2d 1147, 1152 (4th Cir. 1986). To qualify for benefits by showing that his impairment meets or equals a listed impairment, the plaintiff must present medical findings equal in severity to all the criteria for the most similar listed impairment. *See Sullivan v. Zebley*, 493 U.S. 521, 531 (1990); 20 C.F.R. § 404.1526 (an impairment is medically equivalent to a listed impairment if it is at least equal in severity and duration to the criteria of any listed impairment). It was the plaintiff's burden to show that her impairments met or equaled a listing. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

Listing 12.04 requires the following, in pertinent part:

*Affective Disorders*: characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied....

A.   Medically documented persistence, either continuous or intermittent, or one of the following:

1.   Depressive syndrome characterized by at least four of the following

    a.   Anhedonia or pervasive loss of interest in almost all activities; or
    b.   Appetite disturbance with change in weight; or
    c.   Sleep disturbance; or
    d.   Psychomotor agitation or retardation; or
    e.   Decreased energy; or

f.   Feelings of guilt or worthlessness; or
g.   Difficulty concentrating or thinking; or
h.   Thoughts of suicide; or
I.   Hallucinations, delusions, or paranoid thinking; or

... AND

B.   Resulting in at least two of the following:

1.   Marked restriction of activities of daily living; or
2.   Marked difficulties in maintaining social functioning;
3.   Marked difficulties maintaining concentration, persistence, or pace; or
4.   Repeated episodes of decompensation, each of extended duration.

20 C.F.R. § 404, Subpart P, App. 1, 12.04.

The plaintiff argues that the ALJ erred in finding that her impairments did not satisfy the requirements of the B criteria for Listing 12.04. The ALJ found as follows: "The claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06. In making this finding, I have considered whether the 'paragraph B' criteria are satisfied" (Tr. 13). The ALJ went on to find:

The State agency medical consultants opined the claimant had no severe mental impairment with only mild limitations in activities of daily living, social functioning, and concentration, and no episodes of decompensation. . . . Although there is very minimal evidence in the record regarding the claimant's mental impairments, giving her every benefit of the doubt, I find that she is more limited than the consultants' opined for the reasons described below.

In activities of daily living, the claimant has mild restriction. I agree with the State consultants that the claimant has only a mild limitation in this area. The evidence shows the claimant is able to make her bed, wash dishes, do laundry, drive, care for her personal needs, shop, and handle money . . . . this wide range of activities indicates no more than a mild limitation.

In social functioning, the claimant has moderate difficulties. The claimant testified that she does not like being around

16

others. The evidence does not support the claimant's testimony of panic attacks when she goes out in public. Nevertheless, giving her the benefit of the doubt, I find that she has a moderate limitation in this area.

With regard to concentration, persistence or pace, the claimant has moderate difficulties. The claimant testified that she has significant difficulty with concentration. However, she further testified that she enjoys reading and doing crossword puzzles, both of which require the ability to concentrate. She also reported she can pay bills, count change, handle a savings account, and use a checkbook/money orders. . . . Again, giving her the benefit of the doubt, I find the claimant has a moderate limitation in this area.

As for episodes of decompensation, the claimant has experienced no episodes of decompensation which have been of extended duration. There is no evidence of any episodes of decompensation.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitations and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.

(Tr. 13-14).

The plaintiff first relies on a January 13, 2007, letter from Neil Sondov, M.Ed., LPC, in which he indicated that he had seen the plaintiff for two therapy sessions and that she had previously been seen by a counselor in his office on nine occasions between September 2006 and December 2006 (pl. brief at 15, citing Tr. 193). However, as pointed out by the Commissioner, the plaintiff neglects to mention that Mr. Sondov stated that "no issues pertaining to possible impairment have been explored at this juncture" and that Mr. Sondov had seen the plaintiff in connection with recent grief issues and ongoing familial relationship issues (Tr. 193). The letter from Mr. Sondov does not address or establish any functional limitations, much less establish that the plaintiff met any of the B criteria for Listing 12.04.

The plaintiff next points to evidence that she was treated for depression in September, October, and November 2007 (pl. brief at 15, citing Tr. 273-75). Specifically, she points to an October 2007 record that she did not have good results on Lexapro and was changed to Cymbalta (pl. brief at 15, citing Tr. 274). However, she does not mention that at her next appointment in November 2007, it was reported that she was "actually doing well" on Cymbalta – a fact that was noted by the ALJ in his decision (Tr. 12, 273). The evidence cited by the plaintiff fails to identify any marked limitations or episodes of decompensation that would satisfy the B criteria for Listing 12.04.

There is also no merit to the plaintiff's argument that the evidence requires a finding that she had marked limitations with respect to activities of daily living (pl. brief at 16). No doctor opined that the plaintiff had marked limitations in this area. *See Mink v. Apfel*, No. 99-2480, 2000 WL 665664, at *1 (4th Cir. May 22, 2000) (holding that lack of medical restrictions supported the decision that claimant was not disabled). To the contrary, as the ALJ reasonably noted, two different State agency psychologists found that the plaintiff's limitations in this area were mild (Tr. 13, 263, 305). *See Smith v. Schweiker*, 795 F.2d 343, 345-46 (4th Cir. 1986) (holding that opinion of non-examining physician can constitute substantial evidence to support the decision of the Commissioner). The ALJ also pointed to evidence that the plaintiff was able to make her bed, wash dishes, do laundry, drive, care for her personal needs, shop, and handle money to support his conclusion that she had only mild limitations with regard to activities of daily living (Tr. 13-14, 48, 147-51). Although the plaintiff points to other testimony and statements indicating that she needed help with or did not perform certain household tasks, the ALJ did not find the plaintiff's testimony to be fully credible. Further, the limitations relied on by the plaintiff do not require a finding that she had marked limitations in daily living activities that were caused by her depression and anxiety.

18

The plaintiff next argues that the evidence establishes she had marked limitations in the area of social functioning (pl. brief at 16-17). Specifically, the plaintiff argues that she testified that one of the reasons she left a temporary job she had at Clemson Stadium in the later part of 2007 and early 2008 was because she had panic attacks due to the little aisles and crowds (pl. brief at 16, citing Tr. 33). In addition, she points to her own statements that she stays to herself, has little patience with others, and that her depression and anxiety limits her ability to be out in public (pl. brief at 16, citing Tr. 43, 151-53). However, two different psychologists reviewed the record and determined that the plaintiff's limitations in this area were mild (Tr. 263, 265). Moreover, the ALJ reasonably noted that there is no medical evidence in the record to corroborate the plaintiff's claim that she had panic attacks when she went out in public; indeed, the plaintiff never reported such anxiety attacks to her medical providers (Tr. 14, 16). *See Flowers v. Apfel*, No. 98-2112, 1999 WL 150491, at *2 (4th Cir. Mar. 19, 1999) (holding that the fact that the claimant never reported his claimed need to lie down for one to three hours after a seizure to his treating physician was properly used to discredit claimant's subjective complaints). The ALJ nonetheless gave the plaintiff the benefit of the doubt and found that she had moderate limitations in the area of social functioning (Tr. 14). Thus, even if the ALJ had found the plaintiff's complaints to be credible, none of the alleged difficulties in social functioning identified by the plaintiff in her brief were significant enough that it was unreasonable for the ALJ to find that the plaintiff's limitations in this area were moderate rather than marked.

The plaintiff also argues that the ALJ erred when he found that she did not have marked limitations in the area of concentration, persistence, or pace (pl. brief at 17). As the ALJ reasonably noted, although the plaintiff testified that she had significant difficulties with concentration, she also testified that she enjoyed reading and doing crossword puzzles, both of which require the ability to concentrate (Tr. 14, 147, 151). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005) (holding that ALJ can consider a

claimant's activities when evaluating the claimant's limitations). The ALJ also fairly reasoned that the plaintiff's reported abilities to pay bills, count change, handle a savings account, and use a checkbook and money orders were inconsistent with marked limitations in concentration, persistence, or pace (Tr. 14, 150-51). Although the reviewing psychologists found that the plaintiff's limitations in the area of concentration, persistence, or pace were mild (Tr. 263, 305), the ALJ once again gave the plaintiff the benefit of the doubt and found that she had moderate limitations in this area (Tr. 14).

As discussed above, the ALJ gave the plaintiff the benefit of the doubt when he determined that she had mild limitations in activities of daily functioning, moderate difficulties in social functioning, moderate difficulties with concentration, persistence, or pace, and no episodes of decompensation. The ALJ's findings are supported by substantial evidence. Accordingly, this allegation of error fails.


### Residual Functional Capacity

The plaintiff also argues that the ALJ failed to properly assess her RFC in finding that she could perform medium work limited to simple, routine tasks and only occasional conduct with the public. The ALJ must assess a claimant's RFC "based on all the relevant medical and other evidence." 20 C.F.R. § 404.1520(a)(4).

> The Residual Functional Capacity ("RFC") assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work- related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved. . . .

SSR 96-8p, 1996 WL 374184, at *7.

In a disability case, the combined effect of all the claimant's impairments must be considered without regard to whether any such impairment if considered separately would be sufficiently disabling. Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's 'ability to engage in substantial gainful activity.'" *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. *Id.* The cumulative or synergistic effect of the various impairments on the claimant's ability to work must be analyzed. *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

The plaintiff testified that she had extreme limitations that would restrict her ability to perform even sedentary work – including limitations to walking for only 10 feet, standing and walking for only 20 minutes at a time, sitting for only 20 to 30 minutes at a time, and lifting only five to seven pounds (Tr. 41-43). The ALJ concluded that such limitations were not credible based on the record as a whole (Tr. 15-16).

The plaintiff relies on the June 10, 2010, PCE form in support of her argument regarding her RFC. However, as discussed above, this form is not evidence of the plaintiff's limitations during the time period at issue in this case and will not be considered by this court.

The ALJ appropriately considered medical impairments documented in the record. The fact that the plaintiff has certain medical conditions and received treatment for these conditions (pl. brief at 9) does not mean that she is disabled. Rather, the relevant inquiry is whether these conditions caused any functional limitations that affected the plaintiff's ability to work. Although the plaintiff argues that the ALJ erred by failing to give controlling weight to the opinions of her treating physicians (pl. brief 8-9), the record

21

contains no treating physician opinions regarding the plaintiff's functional limitations or restrictions despite her impairments.  *See* 20 C.F.R. § 404.1527(a)(2) (defining medical opinions).  Because there are no treating physician opinions, the ALJ could not have erred by failing to give weight to treating physician opinions.

The ALJ found that the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity" (Tr. 15).  The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996).  A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4).  Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility."  *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001).  Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record."  Furthermore, it "must be sufficiently specific to make clear

to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." SSR 96-7p, 1996 WL 374186, at *4.

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)     the individual's daily activities;

(2)     the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)     factors that precipitate and aggravate the symptoms;

(4)     the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)     treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)     any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)     any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3.

In reaching his conclusion that the plaintiff was not fully credible, the ALJ reasonably relied on the fact that the plaintiff collected unemployment benefits in 2007 and 2008, i.e., during the time when she claims she was disabled (Tr. 16, 25-29, 109-110). As the ALJ correctly noted, acceptance of unemployment benefits requires an individual to indicate that they are ready and willing to work, which is facially inconsistent with a claim of disability. *See Jernigan v. Sullivan*, 948 F.2d 1070, 1074 (8th Cir. 1991) (noting that because an application for unemployment benefits requires a claimant to admit that he is ready, willing, and able to work, an application for unemployment during a claimed period of disability undermines the credibility of the disability claim); *Copeland v. Bowen*, 861 F.2d

23

536, 542 (9th Cir. 1988) (same). *See also Elder v. Astrue*, C.A. No. 3:09-02365-JRM, 2010 WL 3980105, at *10 (D.S.C. October 7, 2010) (noting that ALJ's credibility finding was supported in part by the plaintiff's application for unemployment ). He also discussed the plaintiff's reported daily activities in finding that her credibility was undermined (Tr. 16).

Further, as the ALJ noted, radiological evidence showed that the plaintiff's degenerative disc disease and degenerative joint disease were mild (Tr. 15-16, 337-38). In addition, as the ALJ noted, the plaintiff sometimes reported no pain (Tr. 244, 282). Although the plaintiff was found to have typical fibromyalgia trigger points in March 2008, she was given medications and reported feeling better the following month (Tr. 16, 360). In January 2009, she reported generalized achiness, examination revealed some tenderness over thoracic and lumbar muscles, and she received a prescription for a muscle relaxant (Tr. 16, 367). However, as the ALJ reasonably noted, there is no significant evidence of treatment for fibromyalgia or degenerative disc disease following January 2009 (Tr. 16). In addition, the ALJ noted that the treatment records did not indicate that the plaintiff had any significant loss of strength, sensation, or reflexes, and did not document any gait abnormalities (Tr. 17). The ALJ also reasonably noted that no treating or examining physician opined that the plaintiff had any physical restriction on her ability to work (Tr. 17). *See Lee v. Sullivan*, 945 F.2d 687, 692 (4th Cir. 1991) (holding that a claimant's allegation that he had to recline or lie down several times a day was properly discounted because no physician suggested that claimant's condition required such reclining). Nonetheless, even though the state agency medical consultants opined that the plaintiff had no severe physical impairments (Tr. 252-52, 309), the ALJ again gave the plaintiff the benefit of the doubt and limited her to medium physical exertion (Tr. 17).

Furthermore, as argued by the Commissioner, the ALJ also gave the plaintiff the benefit of the doubt when he found that she was limited to simple, routine tasks and only occasional contact with the public. As the ALJ noted, the plaintiff testified that she had

frequent anxiety attacks, but did not report any such attacks to her medical providers (Tr. 16). This failure to report symptoms also undermined the plaintiff's credibility. *See Flowers*, 1999 WL 150491, at *2. In addition, the ALJ also reasonably relied on evidence that the plaintiff's depression improved after she started on Cymbalta (Tr. 16, 273). A condition that can be reasonably controlled by medication or treatment is not disabling. *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). As the ALJ noted, the state agency psychologists found that the plaintiff had no severe mental impairment (Tr. 17, 263, 305). The ALJ could have relied upon these opinions and found that the plaintiff had no mental limitations. *See Smith*, 795 F.3d at 345-36. However, since the plaintiff had some mental health treatment and the objective evidence showed her mental conditions were controlled by medications, the ALJ gave the plaintiff the benefit of the doubt and limited her to simple, routine tasks that involved only occasional interaction with the public in order to avoid any exacerbation of her symptoms (Tr. 17).

Based upon the foregoing, this court finds that the ALJ did not err in finding that the plaintiff's subjective complaints were not fully credible and further finding that the plaintiff could perform medium work limited to simple, routine tasks and only occasional contact with the public.

### Past Relevant Work

The plaintiff argues that the ALJ's finding that she could perform her past relevant work as a machine loader is not supported by substantial evidence. This court disagrees. If a claimant can still do her past relevant work, the ALJ will find that the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1560(b)(3). Past relevant work is work that the claimant has done within the past 15 years that was substantial gainful activity and lasted long enough for the claimant to learn to do it. *Id.* § 404.1560(b)(1). A vocational expert may offer opinion testimony in response to a hypothetical question about

whether a person with the claimant's limitations can meet the demands of the claimant's past relevant work, either as the claimant actually performed it or as the job is generally performed in the national economy. *Id.* § 404.1560(b)(2).

First, there is no merit to the plaintiff's argument that the June 10, 2010, PCE form refutes the ALJ's finding that the plaintiff could perform her past work as a machine loader (pl. brief at 11). As discussed above, the June 10, 2010, report is not evidence of the plaintiff's abilities during the time period relevant to this case.

The plaintiff also argues that the ALJ's finding that the plaintiff could perform her past relevant work was inconsistent with the vocational expert's testimony:

> The basis provided in the paragraph following [the finding that the plaintiff could perform her past work] states: "The expert further testified the claimant could perform her past relevant work as a machine loader with the above residual functional capacity." This is not correct. The expert specifically noted the Claimant's performance of the machine loader job had been at the light level.

(Pl. brief at 13, quoting Tr. 17). This argument is without merit. The regulations unambiguously state that "[i]f someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. § 404.1567(c). As discussed above, the ALJ found the plaintiff had the RFC to perform medium work, but limited her to simple, routine tasks and only occasional contact with the public. The vocational expert testified that the *Dictionary of Occupational Titles* ("DOT") describes machine loader as a medium occupation, but that the job required only light exertion as it was performed by the plaintiff (Tr. 56). She then testified that a person with the plaintiff's RFC and other vocational factors would be able to do the machine loader job because the RFC allowed for medium exertion, and the job as performed by the plaintiff would be light[5] (Tr. 57). The ALJ found

---

[5]The vocational expert also testified that the plaintiff would not be able to do her past work as a cashier, which was light, because it involved working with the public, which was not allowed with the RFC assessed by the ALJ (Tr. 57).

that the plaintiff was not disabled because she retained the capacity to do the machine loader job as she actually performed it, i.e., at the light rather than medium exertional level (Tr. 17). This finding is supported by the vocational expert's testimony and is consistent with 20 C.F.R. § 404.1560(b)(2) (Tr. 57). Moreover, contrary to the plaintiff's arguments (pl. brief at 14), the fact that the ALJ noted that the plaintiff would "grid out" (i.e., be found disabled under 20 C.F.R., pt. 404, subpt. P., app. 2) if she was limited to sedentary work (Tr. 59) does not change this conclusion. The ALJ did not limit the plaintiff to sedentary work, so his comments regarding what would have happened if she were limited to sedentary work have no bearing on the outcome of this case.

## **CONCLUSION AND RECOMMENDATION**

This court has considered the entire record and finds that the ALJ's decision that the plaintiff was not disabled during the relevant period is based upon substantial evidence. Therefore, it is recommended that the decision of the Commissioner be affirmed.


s/Kevin F. McDonald
United States Magistrate Judge

November 23, 2010

Greenville, South Carolina